United States District Court
Southern District of Texas
**ENTERED**
August 26, 2026
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CAHRMC d/b/a Rice Medical Center,<br><br>*Plaintiff*,<br><br>v.<br><br>QuadraMed Affinity Corporation and N. Harris Computer Corporation,<br><br>*Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 4:25-cv-04462 |

**MEMORANDUM, RECOMMENDATION, AND ORDER**

This is a data breach suit. Defendant QuadraMed Affinity Corporation ("QuadraMed") filed a motion to compel arbitration. Dkt. 4. Defendant N. Harris Computer Corporation ("Harris") filed a motion to dismiss all claims against it. Dkt. 5. Plaintiff CAHRMC d/b/a Rice Medical Center ("Rice Medical") then moved for leave to amend its complaint. Dkt. 18.

After carefully reviewing the motions, the responses, Dkts. 13, 15, 23, the replies, Dkts. 21, 22, 27, the pleadings, and the applicable law, it is ordered that Rice Medical's motion for leave to amend (Dkt. 18) be granted. It is recommended that Harris's motion to dismiss (Dkt. 5) be denied.

In addition, QuadraMed's motion to compel arbitration is granted.[1] But Harris's alternative motion to compel arbitration is denied. And given the foregoing conclusions, Defendants' further request to defer initial disclosures until after a ruling on the pending motions—which was raised via letter pursuant to the undersigned's procedures—is denied as to Harris and granted as to QuadraMed.

## Background

The following facts are, with limited exceptions, drawn from the proposed amended complaint (Dkt. 18-1) and are taken as true. A few other allegations detail undisputed facts pertinent to the arbitration dispute.

Rice Medical is a critical-access hospital, as designated by the Centers for Medicare and Medicaid Services ("CMS") and the State of Texas. Dkt. 18-1 at 3-4. To obtain reimbursement, Rice Medical must report its costs, bad debt write-offs, and uncompensated care. *See id.* at 4, 6. Those reports must be supported by documentation. *Id.*

In June 2010, Rice Medical entered into a Technology License and Hosting Agreement (the "Hosting Agreement") with NextGen Healthcare

[1] A motion to compel arbitration is a non-dispositive matter that a magistrate judge can resolve by order. *See Glob. Indus. Contractors, LLC v. Red Eagle Pipeline, LLC*, 617 F. Supp. 3d 633, 636 (S.D. Tex. 2022) (following the First and Third Circuits' approach); *see also, e.g., Herod v. DMS Sols. Inc.*, 2024 WL 4881439, at *1 n.2 (S.D. Tex. Nov. 25, 2024) (same).

Information Systems, Inc. ("NextGen"). *Id.* at 3; *see also* Dkt. 33 (Hosting Agreement). NextGen agreed to provide Rice Medical with financial administration software services, which Rice Medical relied on to submit claims, issue patient billing statements, and maintain financial records. *See id.* at 3, 6. The Hosting Agreement includes a provision mandating arbitration of "any dispute, controversy, or claim between the parties hereto arising from or relating to the subject of this Agreement …." Dkt. 33-1 at 11 ¶¶ 12.1, 12.2.

On July 5, 2016, Rice Medical received a letter, on "Harris QuadraMed" letterhead, notifying it that QuadraMed—a provider of healthcare software technology and services—had acquired NextGen. Dkt. 18-1 at 4; *id.* at 22 (letter). The letter stated that "QuadraMed Affinity Corporation will assume NextGen's rights and obligations under the Agreements …." *Id.* QuadraMed began providing Rice Medical certain software and services under the Hosting Agreement. *Id.* at 6. It provided a health system software called Opus and a financial system called Sphere. *Id.*

According to the pleading, QuadraMed is directly or indirectly owned by Harris, an information technology conglomerate. *Id.* at 3. Although QuadraMed and Harris appear to be separate legal entities, their exact relationship is unclear. Based on public sources, Rice Medical maintains that two of Harris's "operating groups"—Harris Computer and Harris Healthcare, neither of which is QuadraMed—began controlling Rice Medical's data and

licensed systems. *Id.* at 5, 8. At the same time, Harris reduced support for those services, including by declining to upgrade them and reducing system maintenance. *See id.* at 6-7.

Around August 25, 2023, Defendants suffered a major cybersecurity attack (the "breach"). *Id.* at 7. A "criminal actor" encrypted certain data on Defendants' systems, rendering that data available. *Id.* Rice Medical immediately lost access to Opus, Sphere, and all data maintained by those systems. *Id.* While some data was eventually restored, much of Rice Medical's financial data maintained in Sphere was permanently lost and could not be recreated. *See id.* at 7, 11. Defendants failed to maintain secure backups of that data. *See id.* at 9, 12.

In September 2023, Harris sent two communications to Rice Medical about the breach. Harris first notified Rice Medical on September 15, 2023 about the "cybersecurity incident." Dkt. 18-1 at 26 (PX-B, letter); *see also id.* at 8-9. Harris assured that it was "able to identify the incident quickly and limit its impact" but that Rice Medical's data after February 24, 2022 was "not accessible." *Id.* at 26. Soon after, Harris sent a second notice providing more detail about what data was no longer accessible. *Id.* at 28 (PX-C, September 25, 2023 letter). The notice also stated that Harris was "thoroughly examining all available options and solutions to potentially rebuild" the lost data. *Id.*

Around the same time, Harris was negotiating with the criminal actor responsible for the breach. *See id.* at 10. Neither Harris nor QuadraMed told Rice Medical about those negotiations, the possibility of paying ransom to recover the lost data, or other details about the breach and restoration efforts. *See id.* at 7-10. Harris ultimately decided to forgo paying ransom without first notifying Rice Medical. *See id.* at 10. In doing so, Harris allegedly acted in its own—not Rice Medical's—interest. *Id.*

On August 25, 2025, Rice Medical sued QuadraMed and Harris under Texas law. Dkt. 1-1 at 3-17. Against both Defendants, it alleges (a) fraud by non-disclosure, Dkt. 1-1 at 10-12; (b) gross negligence, *id.* at 13-14; and (4) conversion, *id.* at 14-15. Rice Medical also brings a breach of contract claim against QuadraMed, but not Harris. *Id.* at 12-13.

Defendants removed the case to this Court, asserting diversity jurisdiction. Dkt. 1 (notice of removal). Soon after, QuadraMed filed a motion to compel arbitration and stay litigation. Dkt. 4. Rice Medical responded. Dkts. 13 (sealed), 14 (unsealed, redacted). And QuadraMed replied. Dkt. 21.

Harris filed a motion to dismiss under Fed. R. Civ. P. 12(b)(6). Dkt. 5. Rice Medical responded, Dkt. 15, and Harris replied, Dkt. 22. After obtaining leave of court, Dkt. 29, Rice Medical filed a sur-reply, Dkt. 30.

Rice Medical also requested leave to amend its complaint. Dkt. 18. The request includes a proposed amended complaint with expanded factual

allegations. *See* Dkt. 18-1. Defendants opposed leave to amend, Dkt. 23, and Rice Medical replied, Dkt. 27. In the interim, the parties submitted a letter detailing their dispute over whether Defendants should be allowed to defer their initial disclosures under Fed. R. Civ. P. 26(a) until the motions are resolved. All motions are now ripe for resolution.

## **<u>Analysis</u>**

Although both defendants invoke the arbitration clause, Harris does so only if the claims against it survive dismissal. The Court therefore examines the merits of those claims first. And because Harris's motion to dismiss addressed the original state court pleading, which Rice Medical seeks leave to amend under Fed. R. Civ. P. 15(a)(2), the first step is to determine whether Rice Medical's proposed new allegations would adequately state a claim, such that amendment would be appropriate. All agree that Rice Medical's claims are governed by Texas law.

In its proposed amended complaint, Rice Medical alleges that Harris voluntarily assumed and then breached common-law duties of care by taking control over Rice Medical's data, mishandling it, and making incomplete and misleading disclosures about the data breach. But the pleading does not indicate that Harris owed any contractual obligations and lacks other facts necessary to understand Harris's relationship with QuadraMed regarding the underlying events. So this Court cannot conclude that it would be futile to

pursue tort claims against Harris at this stage. Rice Medical is therefore entitled to amend its complaint, and Harris's motion to dismiss the original complaint should be denied.

Harris's alternative request to compel arbitration fails because it is not a party to the agreement containing the arbitration clause. QuadraMed, however, is a party to that agreement. Because the arbitration clause is valid and encompasses this suit, Rice Medical must arbitrate its claims against QuadraMed. Defendants' further request to defer initial disclosures, which was raised via letter, is denied as to Harris and granted as to QuadraMed.

## I. Rice Medical's motion for leave to amend is granted as to its claims against Harris.

Rice Medical seeks leave to amend its complaint. Dkt. 18. The proposed amended complaint raises the same fraud, gross negligence, and conversion claims against Harris but expands the factual allegations. *Compare* Dkt. 18-1, *with* Dkt. 1-1 at 10-15 (original complaint). Defendants respond that amendment would be futile because the proposed filing does not satisfy federal pleading requirements. *See* Dkt. 23. The Court disagrees.

Harris further argues that amendment would be futile because the claims in the proposed amended pleading should be arbitrated. But as concluded *infra*, Part III.C, Harris has not shown that it is entitled to invoke

the arbitration clause. Because an amendment would not be futile, Rice Medical's motion for leave to amend should be granted.

### A. Legal framework for leave to amend

A party can amend its pleading once as a matter of course. *See* Fed. R. Civ. P. 15(a)(1). Otherwise, a "party may amend its pleading only with the opposing party's consent or the court's leave," which the court should freely give "when justice so requires." Fed. R. Civ. P. 15(a)(2). That standard "evinces a bias in favor of granting leave to amend." *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 994 (5th Cir. 2005) (quotation omitted).

The relevant factors include "[(1)] whether permitting the pleading would cause undue delay in the proceedings or undue prejudice to the nonmovant, [(2)] the movant is acting in bad faith or with dilatory motive, [(3)] the movant had previously failed to cure deficiencies by prior pleadings, or [(4)] the proposed pleading is futile in that it adds nothing of substance to the original allegations or it is not germane to the original cause of action." *Lewis v. Knutson*, 699 F.2d 230, 239 (5th Cir. 1983). Amendment would be futile if a proposed new claim or allegations "could not survive a motion to dismiss" under Federal Rule of Civil Procedure 12(b)(6). *Rio Grande Royalty Co. v. Energy Transfer Partners, L.P.*, 620 F.3d 465, 468 (5th Cir. 2010).

### B. Rice Medical sufficiently alleged a duty to disclose underlying its fraud-by-non-disclosure claim.

Rice Medical claims that Harris committed fraud by non-disclosure by intentionally providing vague and partial disclosures that omitted certain material facts. *See* Dkt. 18-1 at 13-14. Under Texas law, fraud by non-disclosure requires that (1) the defendant intentionally failed to disclose material facts (2) that it had a duty to disclose, thereby (3) leaving the plaintiff unaware and without an equal chance to discover those facts; (4) that the defendant intended the plaintiff to act or refrain from acting based on the nondisclosure; and (5) the plaintiff relied on the nondisclosure, causing harm. *See CBE Grp., Inc. v. Lexington L. Firm*, 993 F.3d 346, 353 (5th Cir. 2021) (citing *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 219-20 (Tex. 2019)). In federal court, parties asserting fraud claims must also "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

Harris contends that it had no duty to disclose the information Rice Medical accuses it of withholding. *See* Dkt. 23 at 6-7. "A failure to disclose information will not support a fraud finding in the absence of … a duty to disclose." *White v. Zhou Pei*, 452 S.W.3d 527, 537 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (citing *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674

(Tex. 1998)). Whether that duty exists presents a question of law. *See id.* (citing *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001)).

Rice Medical does not allege that it shared a confidential or fiduciary relationship with Harris. *See* Dkt. 18-1; *see also* Dkt. 27 at 3-4 (reply brief discussing fraud claim). "[T]he extent to which a duty to disclose exists absent a fiduciary or confidential relationship is unresolved under Texas law and by the Fifth Circuit." *Talarico v. Johnson*, 2023 WL 2618255, at *25 (S.D. Tex. Feb. 7, 2023) (quotation omitted).

But Texas intermediate courts of appeals have noted that a confidential or fiduciary relationship "is but one of the situations under which the duty may arise." *White*, 452 S.W.3d at 538. The list includes "(1) when the parties have a confidential or fiduciary relationship; (2) when one party voluntarily discloses information, which gives rise to the duty to disclose the whole truth; (3) when one party makes a representation, which gives rise to the duty to disclose new information that the party is aware makes the earlier representation misleading or untrue; *or* (4) when one party makes a partial disclosure and conveys a false impression, which gives rise to a duty to speak." *Id.* at 537-38 (emphasis added) (citing *Solutioneers Consulting, Ltd. v. Gulf Greyhound Partners, Ltd.*, 237 S.W.3d 379, 385 (Tex. App.—Houston [14th Dist.] 2007, no pet.)); *see also, e.g., McManaway v. KBR, Inc.*, 2012 WL 13059708, at *13-14 (S.D. Tex. Aug. 18, 2012) (same principles).

Moreover, this Court has observed that even though the Texas Supreme Court has not definitively resolved the issue, "recent decisions suggest a duty to disclose may exist outside a confidential or fiduciary relationship." *Gordon v. Sig Sauer, Inc.*, 2020 WL 6118466, at *5 (S.D. Tex. Oct. 16, 2020). Consistent with *Gordon*, the "uncertainty surrounding the duty to disclose and trend towards recognizing the duty in broader contexts" counsels against adopting Harris's narrow view that would merit dismissing this claim. *See id.* (rejecting lack of confidential or fiduciary relationship as a basis for dismissing at Rule 12(b)(6) stage).

The allegations here fall within the second category where a duty to disclose can arise—namely, where a party voluntarily discloses information but omits material facts. *See* Dkt. 18-1 at 13-14. According to the proposed pleading, Harris sent two letters to Rice Medical about its efforts to retrieve Rice Medical's data and the status of its data after the breach. *Id.* at 14 (citing Dkt. 18-1 at 26, PX-B; Dkt. 18-1 at 28, PX-C). Those communications conspicuously failed to mention that Harris had been negotiating with the criminal actor and unilaterally decided to forgo paying ransom to restore Rice Medical's data. *See id.*

Nor was Rice Medical in a position to learn the omitted facts. *See* Dkt. 18-1 at 15. Harris had interposed itself as an intermediary between Rice Medical and the hackers, leaving Rice Medical dependent on the information

that Harris provided. *See id.* at 10. What Harris failed to disclose was also material. Had Rice Medical known that paying ransom was an option, it could have chosen that route to retrieve its data. *See id.* But Harris allegedly withheld that material information "to keep Rice Medical from invoking its rights, seeking to understand and provide input, and/or otherwise taking steps to obtain a useable copy of the Lost Data." *Id.* at 14.

The foregoing allegations are enough to show that Harris had a duty to disclose important information known to it and unavailable to Rice Medical. *See, e.g., W. Afr. Ventures Ltd. v. Fleming*, 634 F. Supp. 3d 391, 402 (S.D. Tex. 2022) (fraudulent non-disclosure claim was adequately pleaded because "defendants voluntarily disclosed some information without disclosing the whole truth and conveyed a false impression through a partial disclosure"); *Mora v. Koy*, 2013 WL 2289887, at *4 (S.D. Tex. May 23, 2013) ("Absent an equal opportunity to discover withheld information, a duty to disclose might exist."). And the proposed complaint adequately pleads the who, what, when, where, and how of fraud. *See Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003) (pleading standard under Fed. R. Civ. P. 9(b)). Harris's challenge to its duty to disclose should be rejected.

### C. Rice Medical also adequately pleaded that Harris owed a negligence duty to safeguard the data.

Harris also contends that amendment is unwarranted for the gross negligence claim because the proposed pleading fails to rectify deficiencies identified in Harris's motion to dismiss the live complaint. Dkt. 23 at 6-7. In particular, the motion argued that Harris owed Rice Medical no duty of care. *See id.* at 8. Case law in similar contexts, however, shows otherwise.

Absent Texas Supreme Court recognition of a duty "under the same or similar circumstances," *see Hou. Area Safety Council, Inc. v. Mendez*, 671 S.W.3d 580, 582-83 (Tex. 2023), a common law duty may still arise "when a person's conduct poses a foreseeable risk to another that could be avoided by the exercise of ordinary care." *In re ESO Sols., Inc. Breach Litig.*, 2024 WL 4456703, at *9 (W.D. Tex. July 30, 2024). "Courts 'consider[ ] several factors, including the risk, foreseeability, and the likelihood of injury versus the social utility of the actor's conduct, the defendant's burden in guarding against that injury.'" *Id.* (quoting *Washington v. U.S. Dep't of Hous. & Urb. Dev.*, 953 F. Supp. 762, 773 (N.D. Tex. 1996); *see also Greater Hou. Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990)).

Courts addressing data breach suits "have found that a corporation has a duty to safeguard [private information] it chooses to retain." *Cabezas v. Mr. Cooper Grp. Inc.*, 2025 WL 2053287, at *10 (N.D. Tex. July 22, 2025) (reviewing

duty under *Washington* factors); *see also, e.g., In re ESO Sols.*, 2024 WL 4456703, at *9 (duty sufficiently alleged where defendant retained sensitive information); *Cosette, v. Jani-King Int'l, Inc.*, 2026 WL 2253343, at *7 (N.D. Tex. Aug. 4, 2026); *Hawkins v. Scout Energy Mgmt., LLC*, 2025 WL 2244327, at *8 (N.D. Tex. Aug. 5, 2025); *In re Cap. One Consumer Data Sec. Breach Litig.*, 488 F. Supp. 3d 374, 397 (E.D. Va. 2020) (applying Texas law). That is because "[t]he risk of a breach is evident and foreseeable" for a company holding sensitive health and identifying information. *See In re ESO Sols.*, 2024 WL 4456703, at *9; *see also Cabezas*, 2025 WL 2053287, at *10.

The proposed amended complaint plausibly alleges that Harris owed Rice Medical a duty to safeguard its data. Despite having no contractual or other identified obligations to perform services under the Hosting Agreement, Harris began operating the software systems housing Rice Medical's data and asserting control over the security systems that were compromised during the data breach. *See* Dkt. 18-1 at 6-7, 17. Yet Harris failed to implement adequate cybersecurity measures to safeguard those systems and the data, despite the foreseeability of a data breach. *See id.* at 6-7, 11, 17. Moreover, Harris failed to maintain complete backups of the data, despite allegedly knowing that "maintaining and periodically testing full and viable backups of healthcare data is both a requirement under law and a fundamental healthcare industry cybersecurity standard." *Id.* at 12.

All those allegations reflect that Harris's acts and omissions carried a grave and foreseeable risk of leaving Rice Medical's data vulnerable to and being lost to hackers. Those assertions are enough to trigger a common law duty to safeguard Rice Medical's data. *See, e.g., In re Gulshan Mgmt. Servs. Data Breach Litig.*, 2026 WL 1876467, at *3 (S.D. Tex. June 29, 2026) (denying dismissal of negligence claim where defendant "affirmatively collected and maintained the plaintiffs' personal information and allegedly failed to take reasonable steps to secure it").

**D. Whether the economic loss doctrine bars the claims against Harris cannot be resolved at this stage.**

Harris also argues that the fraudulent non-disclosure and gross negligence claims are barred by the economic loss rule because the "alleged conduct relates solely to the duties and obligations set forth in the [Hosting] Agreement …." *See* Dkt. 23 at 7-8. But Harris is not a party to the Hosting Agreement. And the Court cannot determine from the pleading alone that Rice Medical's claims against Harris—a contractual stranger—are foreclosed.

"The economic loss rule generally precludes recovery in tort for economic losses resulting from a party's failure to perform under a contract when the harm consists only of the economic loss of a contractual expectancy." *Chapman Custom Homes, Inc. v. Dallas Plumbing Co.*, 445 S.W.3d 716, 718 (Tex. 2014) (per curiam). Contrariwise, the rule does not bar tort claims stemming from

breaches of duty "independent of the contractual undertaking" if the resulting harm "is not merely the economic loss of a contractual benefit." *See id.* "The rule serves to provide a more definite limitation on liability than foreseeability can and reflects a preference for allocating some economic risks by contract rather than by law." *LAN/STV v. Martin K. Eby Const. Co.*, 435 S.W.3d 234, 235 (Tex. 2014).

Rice Medical contends that its tort claims against Harris are permissible because "[t]he economic loss doctrine does not apply to a stranger to the contract." Dkt. 27 at 4. But the rule is more nuanced than that. It is true that "the mere existence of a contract in the general vicinity of" Rice Medical's data management does not preclude all data-related tort claims against non-parties to that contract. *See Asset Risk Mgmt., LLC v. Comal Energy Servs., LP*, 2026 WL 2023233, at *5 (Tex. App.—Houston [1st dist.] July 14, 2026) (citing *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 419 (Tex. 2011) (observing that "[m]erely because the sewer was the subject of *a* contract does not mean that a contractual stranger is necessarily barred from suing a contracting party for breach of an independent duty" related to the sewer)). On the other hand, "Texas law is clear that the economic loss rule *can* apply in the absence of contractual privity; its application depends on the facts of the specific case." *Id.* at *5 (emphasis added) (collecting cases).

Texas courts have barred tort claims against parties not in contractual privity with the plaintiff where the allegedly tortious acts nonetheless "arise within a contract-regulated framework allocating risk and remedies." *See, e.g.*, *id.* at *10 (negligent misrepresentation claim against accounting firm barred where plaintiff contracted with an energy company to provide construction services and that company contracted with accounting firm). In the *LAN/STV* decision, the Texas Supreme Court held that a general contractor could not bring a negligent misrepresentation claim against the project's architect even though the architect and contractor had no contract between them. *See* 435 S.W.3d at 236. There, the Court reasoned that permitting a tort claim would disrupt the risk-allocation structure because the project operated by a "web of contracts," where the general contractor contracted with a transit agency who then contracted with the architect. *See id.* at 246. It was incumbent on the contractor to sue its contracting counterparty—the transit agency—when the architect failed to fulfill his project obligations, which would allow the agency to sue the architect down the chain. *See id.* at 249-50.

Here, the pleading alone does not reflect that this is the type of "risk-allocation, vertical contracting situation hypothesized in *Sharyland* and *LAN/STV* …." *See Rio Grande City Consol. Indep. Sch. Dist. v. Puentes*, 2020 WL 6878736, at *5 (Tex. App.—Corpus Christi-Edinburg, Nov. 24, 2020, pet. denied). As one court observed, "one thing is clear: Details matter" when it

comes to applying the economic loss rule. *See Barzoukas v. Found. Design, Ltd.*, 363 S.W.3d 829, 834 (Tex. App.—Houston [14th Dist.] 2012, pet. denied). "It matters who contracted with whom to do what. … It matters whether and how multiple parties in a chain of contracts allocated among themselves the risk that participants in the chain would perform deficiently, along with the obligation to pay for deficient performance." *Id.*

In *Barzoukas*, an engineer argued that homeowners' tort claims against him were barred by the economic loss rule. *See id.* at 831-32. Although the homeowners contracted with a housing development company to build their house, the homeowners had no contract with the engineer. *See id.* at 834. The engineer was "portrayed as a subcontractor, but his exact role [was] not clear on this record." *Id.* at 837. Accordingly, the "evidence [fell] short of establishing that" the homeowner's claims against the engineer were "subsumed by a contractual chain in which the risk of [the engineer's] deficient performance already [had] been addressed." *Id.* The court therefore reversed the trial court's order granting summary judgment for the engineer, finding that the tort claims were not conclusively foreclosed. *See id.* at 837-38.

*Barzoukas* is instructive. Although Rice Medical alleges that QuadraMed delegated certain duties under the Hosting Agreement to Harris, it is unclear what—if any—contractual obligations or risk allocation schemes existed between Harris and QuadraMed. Those omitted facts render this

Court unable to resolve whether this is a case "involv[ing] parties in a contractual chain who have had the opportunity to allocate risk" such that the economic loss rule "can apply." *See Rio Grande City Consol.*, 2020 WL 6878736, at *5 (quoting *LAN/STV*, 435 S.W.3d at 248); *see also*, *e.g.*, *Paradyme Asset Mgmt., LLC v. Figurd, LLC*, 2025 WL 515319, at *6 (W.D. Tex. Jan. 20, 2025) (denying dismissal of negligence claim because "the Court cannot conclude that the economic loss rule applies" where "the nature of the parties' agreement is [] unclear and the Court cannot infer there is a 'vertical chain' of contracts").

Nor has Harris invoked any apposite caselaw holding that *LAN/STV*'s rationale extends to this data breach context. *See* 435 S.W.3d at 248 (explaining that "construction disputes ... are good candidates for precluding recovery under the 'economic loss' rule" (quotation omitted)). Rather, Texas courts applying the economic loss rule to contractual strangers have typically done so in the context of construction disputes involving subcontractors. *See, e.g.*, *A&H Props. P'ship v. GPM Eng'g*, 2015 WL 9435974, at *2 (Tex. App.—Austin Dec. 23, 2015, no pet.) (economic loss rule barred negligence claim against construction subcontractor).

"'[W]hether and how to apply the economic loss rule does not lend itself to easy answers or broad pronouncements,' and the Texas Supreme Court directs that 'application of the rule depends on an analysis of its rationales in a particular situation.'" *Paradyme*, 2025 WL 515319, at *4 (quoting *LAN/STV*,

435 S.W.3d at 245-46). More facts are needed to ascertain how and whether the rule may affect Rice Medical's claims. Dismissal based on the economic loss rule is therefore premature and unwarranted.

**E. The conversion claim is not barred as a matter of law.**

Harris contends that Rice Medical's conversion claim fails as a matter of law because Texas does not recognize a claim for conversion of intangible property. *See* Dkt. 23 at 6; Dkt. 5 at 6-7. But a body of Texas decisions signals that Rice Medical's lost data constitutes property that can be converted.

"Conversion is the unauthorized and unlawful assumption and exercise of dominion and control over the personal property of another to the exclusion of, or inconsistent with, the owner's rights." *Universal Plan Servs., Inc. v. Dresser-Rand Grp., Inc.*, 571 S.W.3d 346, 362-63 (Tex. App.—Houston [14th Dist.] 2018, no pet.). Conversion requires that "(1) the plaintiff owned or had possession of the property or entitlement to possession; (2) the defendant unlawfully and without authorization assumed and exercised control over the property to the exclusion of, or inconsistent with, the plaintiff's rights as an owner; (3) the plaintiff demanded return of the property; and (4) the defendant refused to return the property." *Domain Protection, LLC v. Sea Wasp, LLC*, 426 F. Supp. 3d 355, 388 (E.D. Tex. 2019) (quoting *Texas Integrated Conveyor Systems, Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 366-67 (Tex. App.—Dallas 2009, pet. denied)), *aff'd*, 23 F.4th 529 (5th Cir. 2022).

The Fifth Circuit and multiple Texas intermediate appellate decisions have agreed that conversion claims are limited to tangible property. *See, e.g.*, *Real Est. Innovations, Inc. v. Hou. Ass'n of Realtors, Inc.*, 422 F. App'x 344, 350 (5th Cir. 2011) (per curiam); *Robin Singh Educ. Servs., Inc. v. Test Masters Educ. Servs., Inc.*, 401 S.W.3d 95, 97 (Tex. App.—Houston [14th Dist.] 2011, no pet.); *see also F. US, Inc. v. Musselwhite*, 2016 WL 6909297, at *9 (S.D. Tex. Jan. 22, 2016) (collecting cases). Yet those courts have also recognized a "merger exception" "where an underlying intangible right has been merged into a document and that document has been converted." *D'Onofrio v. Vacation Publ'ns, Inc.*, 888 F.3d 197, 213 (5th Cir. 2018) (quoting *Express One Int'l, Inc. v. Steinbeck*, 53 S.W.3d 895, 901 (Tex. App.—Dallas 2001, no pet.)).

Harris contends that the "weight of authority" provides that digital property—including the data at issue here—is intangible property that cannot support a conversion claim. *See* Dkt. 5 at 7. It relies solely on cases addressing the conversion of intellectual property. *See id.* (citing *Beardmore v. Jacobsen*, 131 F. Supp. 3d 656, 667 (S.D. Tex. 2015) (dispute over ownership of iPhone application); *Quantlab Techs. Ltd. (BVI) v. Godlevsky*, 719 F. Supp. 2d 766, 779 (S.D. Tex. 2010) (intellectual property, including trade secret); *Lifesize, Inc. v. Chimene*, 2017 WL 1532609, at *11 (W.D. Tex. Apr. 26, 2017) (data included trade secrets and proprietary information); *Meats by Linz, Inc. v. Dear*, 2011 WL 1515028, at *6 (N.D. Tex. Apr. 20, 2011) (trade secrets)).

Rice Medical acknowledges that Texas courts typically require intangible property to be "represented by a physical document" to support a conversion claim. *See* Dkt. 15 at 3 (quoting *Quantlab*, 719 F. Supp. 2d at 778). But it argues that "Texas courts would find a conversion claim" "if the property at issue would be a physical document but-for the progress of technology …." *Id.* Rice Medical relies largely on a case that found a viable conversion claim premised on the taking of seismic data. *See id.* (citing *In re Yazoo Pipeline Co., L.P.*, 459 B.R. 636, 653 (Bankr. S.D. Tex. 2011)); *see also* Dkt. 27 at 5.

The *Yazoo* decision is well-reasoned and persuasive. There, the court found that data stored and viewable on a computer was tangible property "not different in any relevant respect from" data stored on physical mediums that have been long recognized as tangible property. *See* 459 B.R. at 653. It reasoned that, while "[t]he progression of technology changes the storage and access of the underlying property," it "should not change whether unauthorized control over that property is subject to a conversion claim." *Id.* (citing *Thyroff v. Nationwide Mut. Ins. Co.*, 864 N.E.2d 2172, 1278 (2007) ("It would be a curious jurisprudence that turned on the existence of a paper document rather than an electronic one. Torching a company's file room would then be conversion while hacking into its mainframe and deleting its data would not.")). Similarly, the property at issue here—Rice Medical's financial records—would be physical documents clearly within the scope of Texas

conversion law but-for the progress of technology and the convenience that digital recordkeeping provides. That counsels in favor of permitting the conversion claim.

Another relevant opinion addressed intangible property that was merged into an electronic document. *See Sea Wasp*, 426 F. Supp. 3d at 390-92 (addressing stolen domain names). The court held that "while [the stolen domain names are] not themselves tangible … their correlating information and data [are] stored within" an electronic nameserver, which constitutes a document or collection of documents. *Id.* at 391-92. The court reasoned that federal and Texas law recognize electronic records as having "the same legal effect as paper records." *Id.* at 390 (citing 15 U.S.C. § 7001(a); Tex. Bus. & Com. Code § 322.007(c)). Further, the Restatement (Second) of Torts—which Texas courts often invoke for conversion claims—states that "non-traditional, electronic documents" may still be "eligible documents under the merger exception." *Id.* at 391-92; *see* Restatement (Second) of Torts § 242 (1965); *see also Robin Singh Educ. Servs.*, 401 S.W.3d at 104 (Frost, J., concurring) (the Restatement "only requires merger into a 'document' and that a document can be an electronic record.").

Harris acknowledges the merger exception but does not explain why Rice Medical's records encompassed within the lost data would be excluded from that exception. *See, e.g.*, *Forte Hum. Cap., Inc. v. Shishido*, 2026 WL 493639,

at *6 (W.D. Tex. Feb. 19, 2026) (granting leave to amend where defendants did "not brief how" plaintiffs' corporate books and records, including those that were digital files, "would not fit into the merger exception"). If Rice Medical's records could be converted if retained on paper, so too could those same records if kept in digital form. Because case law supports that construction, amending this claim would not be futile. And because all the proposed claims survive dismissal, Rice Medical is entitled to amend its complaint.

## II. <u>The amended complaint moots Harris's Rule 12(b)(6) motion.</u>

Before Rice Medical sought leave to amend, Harris had moved to dismiss the original complaint under Fed. R. Civ. P. 12(b)(6). Dkt. 5. "It is well-settled in the Fifth Circuit that an amended complaint supersedes the original complaint, and the original complaint has no legal effect …." *See Freilich v. Green Energy Res., Inc.*, 297 F.R.D. 277, 282 (W.D. Tex. 2014) (citing *Eason v. Holt*, 73 F.3d 600, 603 (5th Cir. 1996)). Accordingly "[t]he filing of an amended complaint generally renders pending motions moot." *Stredwick v. Dall. Margarita Soc'y, Inc.*, 2012 WL 12893430, at *1 (N.D. Tex. June 27, 2012) (collecting cases). But "the court has discretion to deny the motion as moot or consider the merits of the motion in light of the amended complaint." *Howard v. John Moore, L.P.*, 2014 WL 5090626, at *1 n.1 (S.D. Tex. Oct. 9, 2014).

Most of Harris's Rule 12(b)(6) arguments challenge the sufficiency of Rice Medical's factual allegations. *See* Dkt. 5. Because the amended complaint

provides more detail about Harris's conduct, it moots Harris's pending motion to dismiss. *Compare* Dkt. 1, *with* Dkt. 18-1. And as concluded above, Harris's legal challenges to the tort claims do not merit dismissal, whether applied to the original or amended pleading. *See supra* Part I.B to E. The motion to dismiss should be denied.

## III. Rice Medical must arbitrate its claims against QuadraMed, but not Harris.

In addition to challenging Rice Medical's claims on the merits, both defendants moved to compel arbitration. *See* Dkts. 4, 5. As concluded below, QuadraMed's motion to compel is granted, but Harris's motion is denied.

### A. Legal standard for motion to compel arbitration

Courts conduct a two-step inquiry when resolving a motion to compel arbitration under the Federal Arbitration Act ("FAA"). First, a court decides whether the parties agreed to arbitrate their dispute. *See OPE Int'l LP v. Chet Morrison Contractors, Inc.*, 258 F.3d 443, 445 (5th Cir. 2001) (per curiam). That inquiry asks both "(1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement." *Id.* (quotation omitted).

At the second step, courts determine "whether legal constraints external to the parties' agreement foreclosed the arbitration of those claims." *Id.* at 446. That determination takes account the FAA's requirement that courts "enforce

privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms." *Volt Info. Scis., Inc. v. Bd. of Trustees of the Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989). "The party seeking to compel arbitration bears the burden to establish the existence of a binding agreement to arbitrate." *Baskin v. Bottini & Bottini, Inc.*, 734 F. Supp. 3d 607, 612 (S.D. Tex. 2024) (citing *Huckaba v. Ref-Chem, L.P.*, 892 F.3d 686, 688 (5th Cir. 2018)).

**B. Rice Medical must arbitrate its claims against QuadraMed.**

QuadraMed contends that Rice Medical is bound to arbitrate all claims against it pursuant to a provision in the Hosting Agreement.[2] *See* Dkt. 4; Dkt. 33-1 at 11 (arbitration agreement). Rice Medical does not dispute that the agreement's arbitration clause is valid. Accordingly, "there is a presumption that [Rice Medical's] disputes will be deemed arbitrable unless it is clear that the arbitration clause has not included them." *See Polyflow LLC v Specialty RTP, LLC*, 993 F.3d 295, 303 (5th Cir 2021) (quotation omitted).

---

[2] QuadraMed motion also attempts to argue that the arbitration agreement applies to Harris. *See* Dkt. 4 at 3-4, 7-8. But QuadraMed cannot seek relief on a co-defendant's behalf. *See, e.g.*, *In re DLN Properties, LTD*, 2018 WL 3109641, at *3 n.41 (E.D. La. June 25, 2018) (collecting cases; Rule 11 "does not permit a defendant to seek relief on behalf of its co-defendant"); *Lopez v. Countrywide Mortg.*, 2008 WL 910073, at *3 (S.D. Tex. Apr. 2, 2008) (defendant did not have standing to challenge service of process on behalf of another defendant).

Rather, Rice Medical contends that its claims fall outside the agreement's scope. *See* Dkt. 14 at 2, 13. Rice Medical "shoulders the burden of proving that" its claims against QuadraMed are "not arbitrable." *See Polyflow*, 993 F.3d at 303 (quoting *Overstreet v. Contigroup Cos.*, 462 F.3d 409, 412 (5th Cir. 2006)). It has not met that burden.

"When deciding whether the parties agreed to arbitrate the dispute in question, courts generally ... should apply ordinary state-law principles that govern the formation of contracts." *Id.* at 302-03 (quoting *Webb v. Investacorp*, 89 F.3d 252, 258 (5th Cir. 1996)). But "due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration." *Id.* at 303 (quoting *Volt Info.*, 489 U.S. at 475-76).

In line with "ordinary state-law principles," the Court "begin[s] with the language of the" Hosting Agreement. *See id.* (applying Texas law). The arbitration clause applies to "any dispute, controversy, or claim between the parties hereto arising from or relating to the subject of this Agreement …." Dkt. 33-1 at 11. That language is expansive. *See, e.g., Polyflow*, 993 F.3d at 303 ("arising out of" and "related to" language evinces a "'broad' arbitration clause"); *Henry v. Cash Biz, LP*, 551 S.W.3d 111, 115-16 (Tex. 2018) (quotation omitted) ("all disputes" language "encompasses more than claims based solely

on rights originating exclusively from the contract[,]" including disputes "relating only indirectly to the [] agreements" (quotations omitted)).

Rice Medical nonetheless argues that its claims do not constitute a "dispute arising from or related to the subject matter of the Hosting Agreement" because of the "unique circumstances caused by the" data breach. *See* Dkt. 14 at 2. But when a "contract contemplates th[e] type of dispute" that later arises, "that dispute falls within the scope of the" arbitration agreement too. *See Winn v. Brunswick Corp.*, 2022 WL 17716385, at *3 (5th Cir. Dec. 14, 2022) (per curiam). And here, the Hosting Agreement expressly encompasses data breaches, other security incidents, and confidentiality concerns. *See, e.g.*, Dkt. 33-1 at 30 (QuadraMed "acknowledge[d] that it is subject to the security and data breach provisions of" federal law and agreed to "report to [Rice Medical] any security incident of which it becomes aware."). Those same duties and obligations underlie Rice Medical's claims. *See, e.g.*, *W.L. Doggett LLC v. Paychex, Inc.*, 92 F. Supp. 3d 593, 599 (S.D. Tex. 2015) (rejecting argument that arbitration agreement "did not contemplate" identify theft, noting the contract's confidentiality provision).

Rice Medical further argues that the "subject" of their contractual relationship "did not extend to permitting a third-party behemoth [Harris] to jeopardize and then effectively abandon Rice Medical's lifeblood data." Dkt. 14 at 13. Setting aside the rhetoric, however, whether and how third parties can

access and use Rice Medical's data is also contemplated by the Hosting Agreement. *See, e.g.*, Dkt. 33-1 at 8 (permitting QuadraMed to grant third parties the right to access the System to provide services on its behalf, subject to confidentiality provisions), 30 (section on "third party agreements").

More fundamentally, under the arbitration provision's wording, it is enough that Rice Medical's claims "relate to" the Hosting Agreement—even tangentially. And whether QuadraMed mis-handled the data is, at minimum, indirectly related to the confidentiality, servicing, and other obligations under that agreement. Rice Medical therefore must arbitrate its claims against QuadraMed.

**C. Harris's alternative motion to compel arbitration is denied.**

In its motion to dismiss, Harris contends that, even if this Court were to find that Rice Medical has stated plausible claims against it, those claims must be arbitrated. *See* Dkt. 5 at 8-9 (alternative contention in motion to dismiss); *see also* Dkt. 22 at 5-6 (reply); Dkt. 23 at 2, 5-6 (opposition to leave to amend). The Court therefore construes Harris's Rule 12(b)(6) motion (Dkt. 5) as including an alternative motion to compel arbitration.

Whether Rice Medical must arbitrate its claims against Harris "turns on the threshold question of 'whether the parties entered into any arbitration agreement at all.'" *See IMA, Inc. v. Columbia Hosp. Med. City at Dall., Subsidiary L.P.*, 1 F.4th 385, 390 (5th Cir. 2021) (quoting *Kubala v. Supreme*

*Prod. Servs., Inc.*, 830 F.3d 199, 201 (5th Cir. 2016)). Because Harris has not shown that it has arbitration agreement with Rice Medical, its alternative request to arbitrate is denied.

No party argues that Harris was a signatory to the Hosting Agreement. "The Supreme Court instructs that a nonsignatory may invoke arbitration so long as the applicable state law allows enforcement by a nonparty." *5556 Gasmer Mgmt. LLC v. Underwriters at Lloyd's, London*, 463 F. Supp. 3d 785, 791 (S.D. Tex. 2020) (citing *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009)). Under Texas law, there is "no presumption in favor of arbitration when determining whether a valid arbitration agreement exists." *Huckaba*, 892 F.3d at 688 (citing *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227 (Tex. 2003)). And "[a]rbitration agreements apply to nonsignatories only in rare circumstances." *IMA*, 1 F.4th at 391 (quoting *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 353, 358 (5th Cir. 2003)). Courts have identified six theories whereby non-signatories may nonetheless enforce an arbitration agreement: "(1) incorporation by reference; (2) assumption; (3) agency; (4) alter ego; (5) equitable estoppel, and (6) third-party beneficiary." *Baskin*, 734 F. Supp. 3d at 612.

"[T]he Texas Supreme Court has distinguished between two different kinds of equitable estoppel: concerted misconduct estoppel and intertwined claims estoppel." *See Hiser v. NZone Guidance, L.L.C.*, 799 F. App'x 247, 248

(5th Cir. 2020) (per curiam) (citing *In re Merrill Lynch Tr. Co. FSB*, 235 S.W.3d 185, 193-94 (Tex. 2007)). And as Rice Medical notes, Texas has "rejected" the concerted misconduct estoppel theory. *See id.*; *see also Al Rushaid v. Nat'l Oilwell Varco, Inc.*, 814 F.3d 300, 305 (5th Cir. 2016) (applying Texas law).

It is unclear which theory Harris relies on here. In its motion to compel arbitration, Harris cited *Grigson v. Creative Artists Agency, LLC*, 210 F.3d 524, 527 (5th Cir. 2000). *See* Dkts. 5 at 8-9; *see also* Dkt. 22 at 5-6. *Grigson* "used the phrase 'intertwined claims' … but did so in reference to concerted misconduct estoppel," which is no longer valid. *Hays v. HCA Holdings, Inc.*, 838 F.3d 605, 611 n.4 (5th Cir. 2016); *see also Hiser*, 799 F. App'x at 248 (denying motion to compel arbitration where moving party "was unclear on which estoppel theory it purported to invoke" but "relied heavily on *Grigson*").

When responding to Rice Medical's motion for leave to amend, Harris invoked intertwined claims estoppel as the basis for demanding arbitration. *See* Dkt. 23 at 2, 5-6. Rice Medical maintains that Harris waived that theory by failing to raise it when moving to dismiss. *See* Dkt. 30 at 2 (citing *Vollmering v. Assaggio Honolulu, LLC*, 2022 WL 6246881, at *9 (S.D. Tex. Sept. 17, 2022)). But even if the argument were preserved, Harris has not shown that the theory applies.

"It is not completely clear that Texas law recognizes intertwined-claims estoppel." *5556 Gasmer Mgmt.*, 463 F. Supp. 3d at 792; *see also Hays*, 838 F.3d

at 610 (noting split amongst Texas courts of appeals). But the Fifth Circuit has made an *Erie* guess that the Texas Supreme Court would adopt that theory. *See Hays*, 838 F.3d at 612; *see also Jody James Farms, JV v. Altman Grp., Inc.*, 547 S.W.3d 624, 639 (Tex. 2018) (noting the Fifth Circuit's *Erie* guess but not resolving the issue). Intertwined claims estoppel has two requirements: "there must be, first, a sufficiently close relationship between the nonsignatory and a signatory, and second, claims that are 'intimately founded in and intertwined with the underlying contract obligations.'" *5556 Gasmer*, 463 F. Supp. 3d at 792 (quoting *Jody James*, 547 S.W.3d at 639); *see also, e.g., In re WeldFit LLC*, 2026 WL 1552411, at *4 (Tex. App.—Houston [14th Dist.] June 2, 2026, orig. proceeding).

The first requirement "mandate[s] a particularly close relationship to invoke [intertwined] estoppel." *Jody James*, 547 S.W.3d at 640 (reviewing but not adopting intertwined estoppel). Neither a "working relationship" nor an "entangled business relationship" between distinct entities are enough "regardless of how intertwined [a plaintiff's] claims are with the [contract]." *See id.*; *see also, e.g.*, *Natgasoline LLC v. Refractory Constr. Servs., Co. LLC*, 566 S.W.3d 871, 889 (Tex. App.—Houston [14th Dist.] 2018, pet. denied) (rejecting intertwined claims estoppel, given evidence that the non-signatory and signatories to the arbitration agreement were "merely independent participants in a business transaction").

Harris offers no evidence—nor any explanation—about its relationship with QuadraMed. It merely argues that Rice Medical "lumps" Defendants together. *See* Dkt. 5 at 8; *see also* Dkt. 23 at 5. It is true that treating defendants as a "single unit in the[] pleadings" and "raising identical factual allegations against" them "cuts in favor a close relationship." *See Vollmering*, 2022 WL 6246881, at *10 (quoting *Newman v. Plains All Am. Pipeline, L.P.*, 23 F.4th 393, 405 (5th Cir. 2022)). But the amended complaint makes distinct allegations against each entity. *See, e.g.,* Dkt. 18-1 at 14 ("Defendant Harris made a decision ... to forego" paying ransom), 16 (alleging that QuadraMed breached the Hosting Agreement by "relinquishing control to Defendant Harris"), 16-17 (alleging that QuadraMed assumed duties of care "when it assumed NexGen's obligations ... under the Hosting Agreement" but Harris assumed duties "when it exercised control over Rice Medical's data"). Harris has not addressed those distinctions.

*5556 Gasmer*, 463 F. Supp. at 792 (rejecting defendant's reliance on an allegation that non-signatory defendants and signatory defendants were in a "contractual scheme" together where defendant "[c]uriously" provided no evidence as to "their supposedly close relationship" with signatory defendant). Harris's motion to compel arbitration is denied.

## Conclusion, Recommendation, and Order

For the foregoing reasons, it is **ORDERED** that Plaintiff CAHRMC d/b/a Rice Medical Center's motion for leave to amend its complaint (Dkt. 18) be **GRANTED**. Rice Medical must file its amended complaint on the docket by **September 4, 2026**.

It is **RECOMMENDED** that Defendant N. Harris Computer Corporation's motion to dismiss (Dkt. 5) Rice Medical's claims against it be **DENIED**.

It is further **ORDERED** that Defendant QuadraMed Affinity Corporation's motion to compel arbitration (Dkt. 4) be **GRANTED**, and that Harris's alternative motion to compel arbitration (Dkt. 5) be **DENIED**.

**The parties have fourteen days from service of this Report and Recommendation to file written objections. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Failure to file timely objections will preclude appellate review of factual findings and legal conclusions, except for plain error. *Ortiz v. City of San Antonio Fire Dep't*, 806 F.3d 822, 825 (5th Cir. 2015).**

Signed on August 26, 2026, at Houston, Texas.

Yvonne Y. Ho
United States Magistrate Judge